UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| LANCELOT ENTERTAINMENT BOSTON, LLC, AS SUCCESSOR IN INTEREST TO KING'S FAIRE, INC., <br><br> Plaintiff, <br><br> v. <br><br> ALPHONSE A. D'AMICO, SR., INDIVIDUALLY AND AS TRUSTEE OF THE RENAISSANCE NOMINEE TRUST, <br><br> Defendant. | Case No.:   1:25-cv-10479 |

## COMPLAINT

Lancelot Entertainment Boston, LLC, as successor-in-interest to King's Faire, Inc. ("Lancelot"), brings this action to protect its business and enforce its legal rights under a long-standing commercial lease with Alphonse A. D'Amico, Sr., as Trustee of the Renaissance Nominee Trust ("D'Amico"). For 25 years, the well-known King Richard's Faire has been operating a medieval summer renaissance festival at 235 Main Street, Carver, Massachusetts 02330 (the "Premises") pursuant to the Lease, dated January 1, 2000 (the "Lease").

Throughout much of 2024, the Parties were in the process of renegotiating the Lease in anticipation of summer 2025. But unbeknownst to Lancelot, Mr. D'Amico was deliberately stalling negotiations – not to finalize a new agreement but to unlawfully seize the business for himself.

While feigning good-faith negotiations, D'Amico was secretly maneuvering to displace Lancelot by contacting the Town of Carver's permitting authorities, Lancelot's insurance providers, and Lancelot's vendors to solicit Lancelot's confidential information for his own use. Worse,

D'Amico actively sought to block Lancelot from continuing its operations at the Premises or elsewhere. Lancelot was forced to purchase an alternative nearby property in anticipation of the next season. Despite these deceptive tactics, D'Amico continues to mislead the public by falsely representing that the King Richard's Faire will continue on his property, where he plans to operate a competing but unrelated festival, in a blatant attempt to divert Lancelot's customer base to him and interfere with Lancelot's business operations.

Lancelot seeks emergency injunctive relief to protect its business and stop D'Amico's fraudulent and unlawful scheme, which constitutes unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), a violation of the covenant of good faith and fair dealing implied in the Lease, unfair and deceptive trade practices prohibited by M.G.L. c. 93A, tortious interference with Lancelot's business relationships, fraud, and conversion. Lancelot urgently requests the Court's intervention to prevent further harm and hold D'Amico accountable for these actions.

## Parties

1. Plaintiff Lancelot is a Delaware limited liability company with a principal place of business at 5 Pine Street, Carver, Plymouth County, Massachusetts. Its sole member is Lancelot Entertainment Operation Holdings, LLC, a Delaware limited liability company with a principal place of business at 3 Allied Dr. #303, Dedham, Massachusetts 02026. The sole member of Lancelot Entertainment Operation Holdings, LLC is Lancelot Entertainment Investment Co., LLC, a Delaware limited liability company with a principal place of business at 3 Allied Dr. #303, Dedham, Massachusetts 02026. Lancelot Entertainment Investment Co., LLC's members are investors (upon information and belief, the investors reside outside Massachusetts) and Lancelot Entertainment Management Investments, LLC, a Delaware limited liability company with a principal place of business at 3 Allied Dr. #303, Dedham, Massachusetts 02026. Lancelot Entertainment Management

Investments, LLC's members are Derek Schoettle (an individual resident of Milton, Massachusetts), Jason Pflaum (an individual resident of Wayzata, Minnesota), and NP Turkey Leg, LLC, a Delaware limited liability company. NP Turkey Leg, LLC's members are Nicholas Peterson (an individual resident of Long Lake, Minnesota) and the MBR 2011 Family Irrevocable Trust (upon information and belief, the trustee is not a resident of Massachusetts).

2.      Defendant Alphonse A. D'Amico, Sr., Individually and as Trustee of the Renaissance Nominee, is an individual and a citizen of Massachusetts and may be served with process at 5 Milano Drive, Saugus, Massachusetts 01906.

## Jurisdiction & Venue

3.      The Court has jurisdiction over this lawsuit under 28 U.S.C. §§ 1131 because the suit arises under the trademark laws of the United States, 15 U.S.C. § 1125(a) (Sec. 43(a) of the Lanham Act).

4.      Additionally, this Court has jurisdiction over the state law claims alleged herein under 28 U.S.C. §§ 1138 and 1367 because these claims are joined with related claims arising under the laws of the United States and because the claims are so related to the federal claims that they form part of the same case and controversy.

5.      This Court has personal jurisdiction over D'Amico because D'Amico resides in this district in Saugus, Massachusetts, and is subject to the jurisdiction of a Massachusetts court of general jurisdiction.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2) because D'Amico resides within this district in Saugus, Massachusetts, and because the Premises at issue is located within this district in Carver, Massachusetts.

**Factual Background**

*A.     The Longstanding Lease and the Success of King Richard's Faire*

7.      For 25 years, King's Faire, Inc. has operated King Richard's Faire, the largest and longest-running Renaissance Faire in New England, under a Lease, dated January 1, 2000 (the "Lease") with D'Amico.

8.      King Richard's Faire is a New England institution, drawing thousands of visitors annually for an immersive 16th-century experience featuring handmade crafts, foods, musicians, singers, dancers, minstrels, mimes, jugglers, whip artists, magicians, comedians, acrobats, animal acts, mud beggars, fire eaters, aerialists, larger-than-life puppets, stilt walkers, knights jousting on horseback, a royal court, and (fictional) King Richard.

9.      The King Richard's Faire is operated on approximately 80 acres of pine forest, owned by D'Amico as Trustee, with multiple stages plus a tournament field for live jousting. The buildings are permanent year-round structures. The Faire runs for eight consecutive weekends during the fall.

10.     In August 2024, Plaintiff Lancelot Entertainment Boston, LLC ("Lancelot") purchased King's Faire, Inc.[1] and was assigned the Lease. Lancelot and D'Amico continued to operate under the remainder of the Lease through December 2024 while negotiating an extension for the upcoming season.

---

[1] Lancelot converted King's Faire, Inc. into King's Faire, LLC.

B.   *D'Amico's Scheme to Steal Lancelot's Business*

11.   In the fall of 2024, during the continuation of the Lease, the Parties were negotiating its extension and potential amendment. However, in or about October, Lancelot discovered D'Amico was secretly plotting to replace Lancelot with his own competing operation. D'Amico was soliciting Lancelot's employees and vendors, attempting to start a competing operation at the same location after the Lease's expiration.

12.   Lancelot immediately sent D'Amico a cease-and-desist letter, informing D'Amico that such actions were unlawful as unfair and deceptive business practices and could not be tolerated. When confronted, D'Amico feigned good faith, claiming he had faced unanticipated delays because of estate planning issues related to the Trust and its asset (the Premises).

13.   Through January 2025, the Parties continued to exchange draft revisions to a proposed Lease extension, and D'Amico continued to assure Lancelot that the lease renewal was imminent. However, at the end of January, Lancelot heard from its contracted builder that D'Amico had assured him, "Don't worry, there WILL be a Faire on the property; it just might not be called King Richard's Faire." D'Amico further promised the Faire would "continue for the next 100 years." D'Amico attempted to coerce Lancelot's artisans into signing documents claiming the faire booths were his property.

14.   Lancelot again confronted D'Amico, who, again, assured Lancelot that a new draft Lease was being reviewed and execution was imminent. With these reassurances, Lancelot continued preparing for the upcoming season,[2] expecting the Lease renewal to be finalized.

---

[2] This year, the Faire is scheduled for weekends August 30th through October 19, 2025.

C.  **The Fraudulent Termination and Exposure of D'Amico's Bad Faith**

15.  After another month of excuses and patiently waiting, on February 20, 2025, Lancelot was blindsided when D'Amico abruptly terminated lease negotiations – revealing the full extent of his calculated deception. That is when Lancelot learned D'Amico's true intentions: to sabotage Lancelot's business – even during the initial term of Lancelot's Lease – while misleading Lancelot and stringing it along throughout the purported "negotiation" process, to buy himself time to put together his competing enterprise and delay any effort by Lancelot to stop him.

16.  Lancelot discovered that D'Amico has been contacting the Town of Carver permitting authorities, Lancelot's insurance providers (on multiple occasions), and Lancelot's vendors to solicit Lancelot's confidential information for his own use and benefit.

17.  D'Amico represented to Lancelot's insurer that he was authorized to obtain King Richard's Faire's confidential information; he is not.

18.  In reality, D'Amico has intentionally and unlawfully made false statements to third parties to access sensitive information to which he is not entitled.

19.  D'Amico has also lied to third parties about other topics, including telling them there were no active lease negotiations with Lancelot when there were and contacting other local faire operators to locate a replacement operator to run the show this year.

20.  In fact, while lease negotiations were ongoing, D'Amico signed a separate lease with a solar company for the Premises, which he could not have agreed to had he extended the Lancelot Lease, evidencing that he never actually intended to sign the lease amendment (as he represented) and was intentionally negotiating in bad faith. He has even gone so far as to make

coercive threats to Lancelot's caretaker in an effort to gain unlawful access to Lancelot's property.

### D. *The Deliberate Attack on Lancelot's Brand and Business.*

21. The 2025 Faire season is fast approaching, and Lancelot has already sold tickets for the 2025 Faire based in part on D'Amico's assurances that the Lease would be extended.

22. D'Amico's conduct is nothing short of an orchestrated attack on Lancelot's brand, deliberately designed to:

   i. **Mislead the public** by falsely claiming that King Richard's Faire will continue at the same location under his control.

   ii. **Exploit the Faire's hard-earned goodwill** while substituting a knockoff event to deceive patrons and divert customers.

   iii. **Illegally claim ownership of Lancelot's property**, including its brand, trailers, tools, kitchen equipment, and costumes, to use in his unauthorized operation.



23. The King Richard's Faire name is well recognized throughout New England at this location and has built significant goodwill over the past several decades. The King Richard's Faire brand and its trademarks are federally protected,[3] and its reputation and customer goodwill are assets. Lancelot's patrons have come to associate "King Richard's Faire" with its unique, quality offerings, and any effort to replicate or confuse this well-recognized brand is actionable under trademark and unfair competition laws.

24. D'Amico was secretly working in bad faith behind Lancelot's back to steal Lancelot's operations and proprietary information to establish a competing business designed to deliberately take over the King Richard's Faire – all while falsely reassuring Lancelot that the

---

[3] Lancelot's live registered trademarks: Registration Nos. 2230031, 5322883, and 2227298.

7

Lease extension was nearly complete, in an intentional effort to prevent Lancelot from being able to set up the fair at another location.

25.     When confronted about his true intentions and conduct, D'Amico has now baselessly asserted that Lancelot has "abandoned" the Premises and has locked away and claimed ownership over *all* of Lancelot's trailers, tools, kitchen equipment, and costumes – presumably to use them in his own operation.

26.     Any effort by Mr. D'Amico or his affiliates to cobble together a competing event will undoubtedly be of inferior quality and will necessarily mislead the public, causing irreparable harm to Lancelot's reputation, business, and customer relationships. This is akin to forcing the Rockettes out of Radio City Music Hall, then hiring a ragtag bunch of amateur dancers to stage an imitation "Christmas Spectacular" under the same branding. Customers would inevitably believe the brand had deteriorated, causing irreparable reputational harm.

E.      *Emergency Relief is Necessary.*

27.     D'Amico's interference and deceptive statements, including falsely assuring the public that a "Faire" will continue at the Premises, constitute a deliberate, fraudulent, and unlawful attempt to divert Lancelot's customer base and interfere with its business operations.

28.     Such conduct is likely to cause immediate and irreparable reputational harm because D'Amico will, if he has not already, soon begin soliciting vendors, employees, and others; contracting with various entities and individuals; and advertising to the public about his knock-off faire.

29.     For these reasons, Lancelot seeks injunctive relief and damages to be determined at trial for the significant value of the continuation of its operation at the Premises and the inevitable harm to its business, goodwill, customer base, and reputation due to D'Amico's fraudulent,

deceptive, and bad-faith conduct. Lancelot expects these damages to total approximately $25 million or more based on the strength of its market presence and business and its historical revenue.

### COUNT I – UNFAIR COMPETITION UNDER THE LANHAM ACT

30.     Lancelot repeats and realleges each preceding paragraph as if fully stated here.

31.     Lancelot is the owner of the following trademarks and, through its predecessor, has continuously used these trademarks in connection with the operation of King Richard's Faire for over 40 years.

| Registration No. | Mark |
|---|---|
| 2230031 | King Richard's Faire |
| 5322883 | King Richard's Faire, The New England Renaissance Festival |
| 2227298 | ![King Richard's Faire logo] |

32.     Lancelot owns U.S. Trademark Registration Nos. 2230031, 5322883, and 2227298 ("Trademarks"), as described above. These registrations are valid and subsisting.

33.     The Trademarks are inherently distinctive. Lancelot and its predecessor have continuously used these marks in the advertising and promotion of King Richard's Faire. As a result of the extensive use and promotion of these marks, the King Richard's Faire has acquired a favorable reputation with consumers as an identifier and symbol of its products, services, and goodwill. Accordingly, the marks for King Richard's Faire are strong and are entitled to broad protection.

34. Lancelot continues to invest substantial sums in promoting its products and services offered under the Trademarks.

35. Even the most rudimentary trademark search would have revealed Lancelot's federal registrations for the Trademarks. Without Lancelot's permission, D'Amico wrongfully continues to attempt to inject confusion into the public by associating with the Trademarks, even after Lancelot sent the cease and desist letter that put D'Amico on actual notice of D'Amico's infringement and Lancelot's prior rights to the Trademarks.

36. D'Amico is insinuating to consumers that D'Amico's faire originates from, is approved by, is sponsored by, is licensed by, or is affiliated or otherwise associated with the King Richard's Faire.

37. D'Amico's conduct is likely to cause confusion, to cause mistake, or to deceive customers and potential customers of Lancelot by suggesting some affiliation, connection, or association with King Richard's Faire.

38. D'Amico's actions, as described above, constitute unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

39. As a direct and proximate result of D'Amico's conduct, Lancelot suffered actual damages and lost profits. D'Amico knew that the unauthorized use of a mark confusingly similar to Lancelot's would result in a benefit to D'Amico. D'Amico's unauthorized use of the Trademarks has unjustly enriched D'Amico at the expense of Lancelot's reputation and goodwill.

40. For the reasons above, Lancelot is also entitled to an award of its attorneys' fees under 15 U.S.C. § 117(a)

### COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

41. Lancelot repeats and realleges each preceding paragraph as if fully stated here.

42. The Lease constitutes a valid, enforceable, and binding contract, which is enforceable by Lancelot – the successor-in-interest of the original tenant King's Faire, Inc. – against the D'Amico.

43. Lancelot and its predecessor performed their obligations pursuant to the Lease.

44. Under the Lease, D'Amico accepted millions of dollars in rent from Lancelot's predecessor.

45. The Lease includes an implied covenant of good faith and fair dealing.

46. D'Amico breached the implied covenant of good faith and fair dealing contained in the Lease by, among other things, actively working to steal Lancelot's operations and proprietary information in order to establish a competing business during the term of the Lease.

47. D'Amico has further breached the implied covenant of good faith and fair dealing by utilizing the foregoing bad faith repeated assurances during negotiation that led Lancelot to rely on the expectation that a lease agreement would be executed in time to prepare for the upcoming King Richard's Faire season.

48. D'Amico misused his rights pursuant to the Lease to gain access to Lancelot's confidential and proprietary information and made false statements to third parties about his rights to access such information, both before and after the Lease terminated, in a bad faith attempt to deny Lancelot the benefits its predecessor had obtained in the Lease.

49. D'Amico then engaged in a duplicitous and extortionate scheme to string Lancelot along in Lease extension negotiations that he never intended to consummate, in order to more successfully compete against Lancelot and ensure that it lost whatever benefits it had gained from its prior 25 years of operating on D'Amico's land.

50. In this manner and others, D'Amico attempted to deny from Lancelot the benefits

of the Lease.

51. D'Amico's breaches of the implied covenant of good faith and fair dealing caused harm to Lancelot, including, but not limited to, risking Lancelot's ability to operate the King Richard's Faire in 2025 (for which tickets have already been sold) and diverting Lancelot's business, which would result in significant financial harm. Lancelot is entitled to damages in an amount to be proven at trial.

### COUNT III – VIOLATION OF M.G.L. c. 93A

52. Lancelot repeats and realleges each preceding paragraph as if fully stated here.

53. D'Amico's conduct constitutes "unfair and deceptive" trade practices within the meaning of M.G.L. c. 93A §§ 2 and 11, together with the rules and regulations promulgated to enforce that statute.

54. Lancelot is a corporate entity engaged in business in Massachusetts, as the tenant, by assignment, pursuant to the Lease of the Premises located in Carver, Massachusetts, and is subject to the protections of M.G.L. c. 93A §§ 2 and 11.

55. D'Amico is engaged in business in Massachusetts as the Landlord pursuant to the Lease of the Premises located in Carver, Massachusetts and is subject to the provisions of M.G.L. c. 93A §§ 2 and 11.

56. D'Amico's unfair and deceptive conduct includes, but is not limited to, attempting to replicate and misappropriate the King Richard's Faire brand, obtaining access to Lancelot's confidential and proprietary information by false pretenses, falsely assuring the public that a "Faire" will continue at the location to create confusion among patrons, fraudulently misrepresenting his intentions to manipulate lease negotiations to gain leverage and obstruct and sabotage the tenant's business, and unfairly compete using Lancelot's own goodwill and business model.

57. In this manner and others, D'Amico attempted to use the Lease and his resultant leverage over Lancelot to force Lancelot out of business and steal its customers.

58. D'Amico's unfair and deceptive conduct and his violation of M.G.L. c. 93A, § 2 were willful and knowing.

59. D'Amico's wrongful conduct occurred primarily and substantially in Massachusetts where the Premises is located and the Parties' dispute is centered.

60. D'Amico's conduct caused harm to Lancelot, including, but not limited to, risking Lancelot's ability to operate the fair and fulfill its contractual obligations to its patrons, which would result in significant financial harm, and harming the strength and value of Lancelot's Trademarks.

61. Pursuant to M.G.L. c. 93A, § 11, Lancelot is entitled to up to three, but not less than two times its actual damages, as well as its reasonable attorneys' fees and costs incurred in connection with this case.

**COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

62. Lancelot repeats and realleges each preceding paragraph as if fully stated here.

63. Lancelot had ongoing advantageous relationships with third-party builders, vendors, performers, insurers, and artisans for the operation of King Richard's Faire at the Premises. D'Amico knew of Lancelot's relationships.

64. Upon information and belief, D'Amico capitalized on this knowledge and made fraudulent misrepresentations to knowingly persuade or induce such third-party vendors, performers, insurers, and artisans to break the relationships and/or cause the services of such third-party vendors, performers, insurers and artisans to be more expensive or burdensome for Lancelot.

65. D'Amico's improper interference with the relationships, in addition to being intentional, was done in bad faith and with improper motive or means.

66. D'Amico's interference with Lancelot's business relationships has caused, and continues to cause, significant harm to and interference with Lancelot's relationships with its third-party vendors, performers, insurers, and artisans.

67. As a direct and proximate result of D'Amico's conduct, Lancelot suffered actual damages and lost profits in an amount to be determined at trial.

### COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

68. Lancelot repeats and realleges each preceding paragraph as if fully stated here.

69. Lancelot had contracted with third-party builders, vendors, performers, insurers, and artisans for the operation of King Richard's Faire at the Premises. D'Amico knew of Lancelot's contracts.

70. Upon information and belief, D'Amico knowingly induced the third parties to break contracts with Lancelot

71. D'Amico's improper interference with the relationships, in addition to being intentional, was done with improper motive or means.

72. D'Amico's interference with Lancelot's business relationships has caused, and continues to cause, significant harm to and interference with Lancelot's relationships with its third-party vendors, performers, insurers, and artisans.

73. As a direct and proximate result of D'Amico's conduct, Lancelot suffered actual damages and lost profits in an amount to be determined at trial.

### COUNT VI – FRAUD

74. Lancelot repeats and realleges each preceding paragraph as if fully stated here.

75. D'Amico made multiple false representations of material fact to Lancelot. D'Amico falsely represented that he was engaging in good faith negotiations to renew and/or amend the lease and that the parties would execute such an extension imminently, while, in reality, he was simultaneously working behind the scenes to replace Lancelot with his own directly competing operation and never intended to renew the Lease.

76. D'Amico knew these representations were false or made them with reckless disregard for the truth. Despite repeatedly assuring Lancelot that a Lease renewal was forthcoming, D'Amico secretly sought to eliminate Lancelot and establish his own competing event.

77. D'Amico knew or should have known that Lancelot would rely on his false statements and, in fact, he made his false representations with the intent to induce Lancelot to act upon them.

78. By falsely assuring Lancelot that a lease renewal was imminent, D'Amico prevented Lancelot from having the time to evaluate, secure, advertise, and outfit an appropriate alternative venue in time for the upcoming season.

79. D'Amico's misrepresentations delayed Lancelot's decision-making, causing it to invest further time and resources in negotiations that were never intended to succeed.

80. D'Amico deceived vendors, performers, and business affiliates, seeking to gain control of their relationships with Lancelot and induce them to shift their loyalty away from Lancelot.

81. Lancelot reasonably relied upon D'Amico's false representations.

82. Lancelot continued investing time, money, and resources into lease negotiations based on D'Amico 's representations.

83. Had Lancelot known the truth, it would have immediately sought alternative locations and business strategies to protect its operations.

84. D'Amico's misrepresentations prevented Lancelot from taking necessary steps to safeguard its business, vendors, and brand presence.

85. As a direct and proximate result of D'Amico's fraudulent misrepresentations, Lancelot suffered significant financial and reputational damage, including but not limited to, lost revenue and business opportunities due to the inability to plan and market the upcoming season properly; disruption of vendor and performer relationships, causing uncertainty and reputational harm; unnecessary expenses and costs incurred in reliance on D'Amico's misrepresentations; and market confusion and customer loss, as patrons and industry partners were deceived into believing that the King Richard's Faire event would continue, even though he intended it to be under his control.

86. As a result, Lancelot is entitled to damages in an amount to be determined at trial, along with injunctive relief to prevent further imminent fraudulent conduct and protect its business from further harm.

### COUNT VII – CONVERSION

87. Lancelot repeats and realleges each preceding paragraph as if fully stated here.

88. D'Amico intentionally and wrongfully exercised control and/or dominion over Lancelot's personal property (including trailers, tools, kitchen equipment, costumes, etc.).

89. Lancelot had an ownership and/or possessory interest in the property at the time of the conversion.

90. Lancelot stored and maintained this property on the leased Premises as part of its business operations.

91. D'Amico, despite lacking any ownership claim, unlawfully took possession of and asserted control over Lancelot's property, preventing Lancelot access to retrieve these items.

92. Lancelot demanded that D'Amico return the property in question, and he refused, demonstrating a clear intent to deprive Lancelot of its rightful possession.

93. Upon information and belief, D'Amico intends to repurpose or use Lancelot's property for a competing operation, further compounding the harm to Lancelot's business.

94. As a direct and proximate result of D'Amico's conduct, Lancelot is entitled to damages in an amount to be determined at trial, including its relevant lost profits and other amounts.

## COUNT VIII – REQUEST FOR INJUNCTIVE RELIEF

95. Lancelot repeats and realleges each preceding paragraph as if fully stated here.

96. Lancelot is entitled to temporary, preliminary, and permanent injunctive relief to prevent D'Amico from further unlawfully damaging, diluting, misusing, or otherwise harming Lancelot's Trademarks, rights, property, business relationships, and goodwill.

97. Lancelot requests that the Court enter such temporary and preliminary injunctive relief upon proper Motion and enter such permanent injunctive relief after trial.

## REQUEST FOR RELIEF

WHEREFORE, Lancelot respectfully requests that the Court:

a. Enter judgment in Lancelot's favor on each count of this Complaint;

b. Award Lancelot temporary and preliminary injunctive relief upon proper Motion and enter permanent injunctive relief after trial;

c. Award Lancelot its actual damages in an amount to be determined at trial, as well as up to three, but not less than two, such actual damages, pursuant to M.G.L. c. 93A, § 11;

d. Award Lancelot its reasonable attorneys' fees and costs incurred in connection with this case, pursuant to M.G.L. c. 93A, § 11 and/or 15 § U.S.C. 1117(a);

e. Award Lancelot prejudgment and post-judgment interest, as authorized by law; and

f.     Award Lancelot such further relief the Court deems just and proper.

                              Respectfully submitted,

                              Lancelot Entertainment Boston, LLC

                              By its attorneys,

*/s/ Aaron D. Rosenberg*
Aaron D. Rosenberg (BBO# 684826)
SHEEHAN PHINNEY BASS & GREEN, PA
28 State Street
22nd Floor
Boston, MA 02109
(617) 897-5600
arosenberg@sheehan.com

Alexandra W. Wahl (application for admission *pro hac vice* to be filed)
Texas Bar No. 24071581
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile:  (214) 692-6255
alex.wahl@wickphillips.com

Dated: February 27, 2025

18